**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GRIF R. LIPPENCOTT, | |
| Plaintiff, | |
| v. | |
| INVESTIGATOR NICHOLAS LIBERIO, INVESTIGATOR GREGORY KLEBBA, INVESTIGATOR DAVID ZDAN, INVESTIGATOR KENNETH HEATING, SERGEANT ERIN GIBLER, DEPUTY CHIEF of POLICE CHAD BISSEGGER, CATHERINE LIPCOTT, COUNTY OF DUPAGE, CITY OF NAPERVILLE | Case No. 25-cv-01646 Judge Mary M. Rowland |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Grif R. Lippencott sues Defendant Investigators Nicholas Liberio, Gregory Klebba, David Zdan, Kenneth Heating ("County Defendant Officers"), Sergeant Erin Gibler, Deputy Chief of Police Chad Bissegger ("City Defendant Officers"), private citizen Catherine Lipcott, County of DuPage, and City of Naperville. [1]. Lippencott brings claims against the City and County Defendant Officers pursuant to 42 U.S.C. § 1983 (Count I, Count II, Count III), City Defendants Gibler and Bissegger pursuant to the federal Due Process Clause (Count IV), against all individual Defendants pursuant to various state law claims, and against all individual Defendants for punitive damages. The County of DuPage and the City of

1

Naperville are named for indemnification purposes only. Before the Court is Defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), [20]; [23]. For the reasons stated herein, Defendants' motions to dismiss [20]; [23] are granted in part and denied in part.

## I.    Background

The following factual allegations are taken from the Complaint [1] and are accepted as true for the purposes of the motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Lippencott was a police officer at the Naperville Police Department ("NPD"), holding various positions, including Patrol Officer, Special Operations, Canine Unit, and SWAT. *Id*. at ¶¶ 24-25. Lippencott lived with his wife Defendant Catherine Lipencott in Naperville, Illinois. [1] at ¶ 22. The Complaint describes a fraught relationship.

In January 2012, Lippencott learned the NPD was investigating Catherine for forgery. *Id*. at ¶¶ 26-27. Shortly after, he filed for divorce and requested custody of the couple's children. *Id*. at ¶ 28. On June 26, 2012, Catherine was arrested for theft. *Id*. at ¶ 31.

Several years later, on December 7, 2017, Lippencott experienced a severe mental health crisis, causing him to seek leave from his role as a Police Officer. *Id*. at ¶ 36. He was diagnosed with post-traumatic stress disorder because of his service as a Marine. *Id*. at ¶ 37. Lippencott voluntarily gave up his Firearm Owner's Identification (FOID) card privileges, and on February 27, 2018, he completed a

transfer of his weapons to Catherine. *Id*. at ¶¶ 38-39. By June 1, 2018, the NPD placed Lippencott on disability, and he resigned from the NPD. *Id*. at ¶ 41.

On October 19, 2021, Catherine and Lippencott had a verbal altercation; Sgt. Gibler responded to the scene and Officer Keating authorized the incident report for the call. *Id*. at ¶ 42. A few months later, on February 13, 2022, Catherine and Lippencott had a physical altercation, and Lippencott filed a police report accusing Catherine of domestic battery. *Id*. at ¶ 43. Lippencott asserts that Catherine lied to the authorities during their investigation by claiming she did not physically assault Lippencott. *Id*. at ¶ 44. Lippencott alleges that Catherine admitted in a text to her sons that she had "choked Lippencott out".[1] *Id*.

On February 20, 2022, Catherine and her son removed all the weapons from the shared residence. *Id*. at ¶ 47. After Lippencott moved to an apartment in Warrenville, Illinois in April, Catherine and her son brought the firearms back to the couple's formerly shared residence in Naperville and put them in the safe. *Id*. at ¶¶ 49-50. By January 2023, Catherine and Lippencott's relationship had completely deteriorated. *Id*. at ¶ 51.

### A. The current investigation

On January 19, 2023, Catherine served Lippencott with a motion for the exclusive possession of their shared property. *Id*. at ¶ 53. The next day Catherine filed a police report with the NPD accusing Lippencott of telephone harassment. *Id*.

---

[1] On February 18, 2022, Catherine brought the minor child to their eldest daughter's home and (1) instructed her daughter to not allow Lippencott to see the minor child, and (2) convinced the daughter to report an argument she had with Lippencott to the NPD. *Id*. at ¶ 45, 46. Sgt. Gibler was involved in preparing a report about the incident. *Id*.

at ¶ 54. After speaking with officers, Catherine sent a text to her son stating that she "stirred the pot today." *Id*. at ¶ 55.

Sgt. Gibler interviewed Lippencott telephonically (apparently about Catherine's report of telephone harassment). Lippencott described Catherine's erratic behavior and shared his fears about the firearms at the Naperville residence. *Id*. at ¶ 56. According to Lippencott, Sgt. Gibler was aware of Catherine's prior arrest record and pattern of lying. *Id*. at ¶ 57. On January 22, 2023, Lippencott emailed Sgt. Gibler to inquire about the safety of his minor child. *Id*. at ¶ 58.

In the meantime, on January 17, 2023, Lippencott completed an assessment to have his FOID card reinstated. *Id*. at ¶ 52. On January 28, 2023, Dr. Carrie Steiner submitted a positive evaluation for Lippencott's FOID card reinstatement, noting that it would be beneficial professionally for him to have his card. *Id*. at ¶ 60.

Sometime prior to January 31, 2023, NPD referred the matter to the DuPage County State's Attorney's Office ("DCSAO"). *Id*. at ¶ 61. DCSAO Investigator Liberio prepared a report stating that Bissegger contacted him on February 14, 2023, about an on-going criminal investigation of Lippencott. *Id*. at ¶ 62. Liberio reported that there were six different police reports involving Lippencott and Catherine between 2017 and 2023. *Id*. Liberio wrote that "Sgt. Gibler [related that Catherine] … will not be returning to the residence due to her fear of Lippencott. [Catherine] added that there are numerous firearms and weapons in the house, she estimates about 17-20 guns, which are locked in a stand up safe that Lippencott changed the combination to ensure he was the only [one] having access to the firearms. Sgt. Gibler noted in her

report that Lippencott has a revoked FOID card due to a previous incident. *Id.* at ¶ 63.

Lippencott alleges Liberio relied on statements that he knew to be false when creating this report and failed to adhere to established law enforcement standards (*e.g.*, asking Catherine follow-up questions). This misconduct led to Lippencott's arrest without probable cause. *Id.* at ¶¶ 65-67. Lippencott also alleges that Liberio worked with the Illinois State Police to deny Lippencott the reinstatement of his FOID application. *Id.* at ¶ 68.

On February 8, 2023, Catherine gave her phone to Sgt. Gibler for evidence. *Id.* at ¶ 69. At 6:15 pm, Gibler brought Catherine's phone to the NPD Computer Crimes Lab, requesting all communication between Lippencott and Catherine be extracted. *Id.* at ¶ 70. After the extraction was completed, Catherine's phone was returned to Gibler at approximately 9 pm. A digital report and copy of the exam were submitted into evidence the following day. *Id.*

On February 9, 2023, Catherine texted C.L., the couples' son, with a picture of the guns and stated that she spoke to the person at the gun store about the potential sale of the guns. *Id.* at ¶ 71. C.L. texted the first four numbers of the safe code, and Catherine responded with the last three numbers, establishing that she always knew the gun safe's combination and that she had created the code. *Id.* at ¶ 71. That same day, Liberio asked Catherine for written consent to allow law enforcement officers to enter the Naperville home and retrieve the guns. *Id.* at ¶ 71. Catherine signed the consent form. *Id.*

On February 10, 2023, the Illinois State Police (under the NPD and DCSAO's direction) denied Lippencott's FOID card application. *Id*. at ¶ 73. On February 14, 2023, Deputy Chief Bissegger contacted the DCSAO's Investigator Office and requested assistance on Lippencott and Catherine's case. *Id*. at ¶ 74. That same day, under Liberio's direction, Investigator Klebba drafted a report that claimed: (1) Lippencott had several guns in the Naperville home, (2) Lippencott was the sole possessor of the gun safe's combination, and (3) Lippencott was the only person living in the Naperville home. *Id*. at ¶ 75. The next day, Klebba authored a pen register stating that a warrant had been issued for Lippencott. *Id*. at ¶ 76. The warrant was dated December 12, 2022, and entered by Judge Jennifer Martin. *Id*. Klebba further claimed that (1) Lippencott was an armed and dangerous fugitive, (2) Catherine did not have access to the gun safe until February 9, 2023, and (3) Catherine guessed the seven digit code. *Id*. at ¶¶ 77-78.

On February 16, 2023, the DCSAO approved Klebba's search warrant application for Lippencott's telecommunication records for the next sixty days and the telephone records from November 1, 2022, through the date of the order. *Id*. at ¶ 79. The application, authored by Klebba, stated that Lippencott "is wanted (armed/dangerous) for Harassment By Telephone." *Id*. With directive from the DCSAO, their investigators Liberio, Klebba, Zdan and Keating—along with Gibler, and Bissegger—accepted Catherine's fabricated theory that Lippencott had access to the gun safe without a valid FOID card. *Id*. at ¶ 80. All City and County Officer

Defendants ignored exculpatory evidence showing that Lippencott did not have access to the gun safe and could not have committed the firearm related felony. *Id*.

On February 17, 2023, Lippencott was apprehended after he was stopped by a DuPage County Deputy squad car. *Id*. at ¶ 81. Lippencott's arrest was supported by various unmarked vehicles and nearly a dozen SWAT team members from the Illinois State Police, armed with long guns and ballistic shields. *Id*. Lippencott was charged with nineteen counts of Unlawful Violation of the Firearm Owner's Identification Card Act under 430 ILCS 65/2(a)(2) and 430 ILCS 65/14(c)(1). *Id*. at ¶ 82. The information alleged that Lippencott personally possessed nineteen firearms without a valid FOID card. *Id*. Liberio, Black, Keating, Klebba, and Zdan were all present at Lippencott's arrest. *Id*. at ¶ 83. Under Liberio's direction, Keating authored a document for the Illinois State Police claiming that Lippencott was a clear and present danger, "who, if granted access to a firearm or ammunition, pose[s] an actual, imminent threat of substantial bodily harm to themselves or others that is articulable and significant, or who will likely act in a manner dangerous to public safety." *Id*. at ¶ 84. Liberio stated that Lippencott has been "growing aggressive" towards Catherine in the recent months, and that Lippencott has been living in the Naperville home alone for the past six weeks. *Id*.

During Lippencott's bond hearing, an Assistant States Attorney (ASA), based upon information from investigators, claimed that Lippencott had discharged a firearm during his mental health crisis in December 2017, which was false. *Id*. at ¶ 86. The ASA claimed that investigators were securing warrants for firearm

possession. *Id*. at ¶ 87. Lippencott was held overnight because of Klebba's delay in submitting the Firearms Criminal Complaint to DuPage County Jail. *Id*. at ¶ 88. Even though the complaint was completed by 2:30 p.m., the complaint was not delivered until after the bond hearing occurred. *Id*. The next day, February 18, 2023, Lippencott was present at a bond hearing when the ASA again claimed falsely that Lippencott had discharged a firearm in December 2017 within his residence. *Id*. at ¶ 89.

Two days later, Klebba and Liberio questioned Lippencott's father, Robert Lippencott. *Id*. at ¶ 90. After speaking with Robert, Klebba wrote a report omitting critical details from the interview, for instance, Klebba removed Robert's statements that Catherine had been charged with forgery and was a habitual liar. *Id*.

On March 9, 2023, the ASA assigned to the case and Zdan participated in a grand jury proceeding. *Id*. at ¶ 91. At the proceeding, Zdan testified that Lippencott had "secured firearms within a safe and modified the combination to limit access exclusively to himself." *Id*. at ¶ 92. Zdan knew this statement was false. *Id*. On March 2, 2023,[2] the Court ordered discovery. *Id*. at ¶ 93. On March 17, 2023, Lippencott was terminated from employment with MSA Security. *Id*. at ¶ 94. At the time of his arrest, Lippencott was in the hiring process for a Regional Canine Handler position with the TSA. *Id*. at ¶ 95. His job offer was rescinded upon the prospective employer learning of Lippencott's arrest. *Id*.

---

[2] It appears that this is a typographical error, and the Plaintiff may mean March 12th.

On May 31, 2023, Catherine admitted to Klebba that: (1) she never observed Lippencott in possession of weapons, and (2) Lippencott did not have access to the gun safe. *Id*. at ¶ 97. The report specifically stated

> …Kate asked about how Lippencott was going to be prosecuted for the guns found in the safe, when she never saw him with the guns. I told Kate that my understanding was that Lippencott was the only person with the combination to the safe, and C.L. got into the safe by her having C.L. try a password that Lippencott used in the past being a combination of his employee ID and badge number from Naperville Police. Kate gave this information to Deputy Chief Liberio, Inv. Black, Amanda Grey, Monica DeSanto and Gianna Trembino on February 15, 2023. Kate said that was not true and the number was an old telephone number that she used when she grew up.

*Id*. According to the complaint, while Klebba and each of the Police Officer Defendants had always known the allegations about Lippencott changing the safe code were false, by May 31, 2023, everyone involved in Lippencott's prosecution knew that the entire investigation about unlawful possession of weapons was a "witch-hunt". *Id*. at ¶ 98.

On June 9, 2023, Klebba reviewed the evidence extracted from Catherine's phone in February. *Id*. at ¶ 99. After further discovery was ordered by the court on June 4, 2024, the State's Attorney's Office produced the exculpatory discovery it had been withholding for eighteen (18) months. *Id*. at ¶ 100. Lippencott's gun charges trial was scheduled for August 8, 2024. *Id*.

On July 29, 2024, the State's Attorney's Office *nolle prossed* the nineteen weapons charges as part of an agreement, stating "after a thorough review of the facts, [the SAO] cannot proceed with the weapons possession case." *Id*. at ¶ 101.

9

On February 18, 2025, Lippencott filed this complaint alleging various claims under § 1983, Illinois state law, indemnification, and punitive damages. [1]. Before the Court is Defendants' motions to dismiss for failure to state a claim under F.R.C.P. 12(b)(6). *See* [20]; [23].

## II.    Standard

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

## Discussion

Defendants move to dismiss Plaintiff's complaint, primarily arguing that the existence of probable cause defeats Plaintiff's § 1983 claims and his state law malicious prosecution claim, Plaintiff's First Amendment claim fails as a matter of law, Plaintiff's due process claim sounds in the Fourth Amendment, Plaintiff's state law claims of False Arrest, False Imprisonment, Conspiracy, Negligent and Intentional Infliction of Emotional Distress are time-barred, Plaintiff's state law conspiracy claim is duplicative, and "punitive damages" is not a cause of action. *See e.g.* [21]; [23]. The Court addresses each argument in turn below.

### A. Deputy Chief Bissegger and Sargeant Gibbler are dismissed in their official capacity

As a threshold matter, Defendants Bissegger and Gibler argue they should be dismissed in their official capacity because Lippencott sued the City of Naperville. [21] at 4. Lippencott concedes this argument. [25] at 4. Defendants Bissegger and Gibler are therefore dismissed in their official capacities. *See e.g. Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) (affirming dismissal

of the individual defendants in their official capacities because the plaintiffs also sued the government entity itself).

### B. Plaintiff's Fourth Amendment claims survive

Defendants argue that Lippencott's Fourth Amendment claims (Count I for false arrest) and (Count III for unlawful pretrial detention) should be dismissed because of the existence of probable cause as to the phone harassment charges. [21] at 5-7; [23] at 4-5. Additionally, City Defendants Bissegger and Gibler argue that they were not involved in Lippencott's arrest or prosecution. [21] at 7. Lippencott responds that probable cause never existed on the firearm offenses, ([25] at 5; [26] at 4), and that the City Defendant Officers *were* involved in his arrest. [25] at 5. The Court discusses each argument below.

#### 1. *Plaintiff asserts a lack of probable cause to arrest*

The existence of probable cause defeats claims for false arrest and unlawful pretrial detention. *Coleman v. City of Peoria*, 925 F.3d 336, 350 (7th Cir. 2019) "To prevail on a false-arrest claim under § 1983, a plaintiff must show that there was no probable cause for his arrest." *Neita v. City of Chicago*, 830 F.3d, 494, 497 (7th Cir. 2016) (internal citation omitted). To bring an unlawful pretrial detention claim, plaintiff must allege that "the defendants (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in his favor." *Williams v. City of Chicago*, 315 F.Supp. 3d

1060, 1070 (N.D. Ill. 2018) (internal citation and quotation marks omitted).[3] Furthermore, an officer has probable cause if the totality of the circumstances known to him at the time would warrant a prudent person to believe "that the suspect has committed, is committing, or is about to commit an offense." *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009).

Here, Lippencott has alleged that the City and County Defendants relied on fabricated statements by Catherine that they *knew* to be false to establish probable cause to arrest him. Lippencott relies on Sgt. Gibler's knowledge of Catherine's previous arrest for theft and pattern for deceit. [1] at ¶ 57. Sgt. Gibler is also alleged to have noted in her report to Investigator Liberio that Lippencott has a revoked FOID card "*due to a previous incident*" *Id*. at ¶ 63. (emphasis added). Defendant Bissegger ignored exculpatory evidence that Lippencott did not have access to the gun safe and could not have committed the felony. *Id*. at ¶ 80.

Lippencott alleges that the ASA, relying on information from the County Defendant investigators, falsely claimed at his bond hearing that he had discharged a firearm during his mental health crisis in 2017. *Id*. at ¶ 86. The County investigators relied on knowingly fabricated evidence to obtain the warrant (*id*. at ¶¶ 65-67, 77-78, 90), accepted and repeated Catherine's known fabricated theory (*id*. at ¶¶ 80, 92, 98), omitted critical excerpts from Lippencott's father's statement to police (*id*. at ¶ 90) and lied to the grand jury (*id*. at ¶ 92). These allegations, taken as true

---

[3] The Supreme Court has held that the Fourth Amendment's right to be free from unlawful seizure extends to claims for unlawful pretrial detention under *Manuel v. City of Joliet (Manuel I)*, 580 U.S. 357, 358 (2017).

(as they must be at this stage), mean Lippencott's arrest for the firearms offense was not supported by probable cause. *See Chachere v. City of Chicago*, 2018 WL 1086743, at *7 (N.D. Ill. Feb. 28, 2018) (fabricated evidence does not support probable cause); *see also Franks v. Delaware*, 438 U.S. 154 (1978) (false statements included by police knowingly or with reckless disregard for the truth where the false statement is necessary to the finding of probable cause are invalid); *Olson v. Champaign County, Ill.* 784 F.3d 1093 (7th Cir. 2025) ("Officers do not act reasonably if they intentionally or recklessly provide false information to obtain a warrant.").

Defendants respond by asking the Court to take judicial notice of several exhibits attached to their motions to dismiss. *See* [21-1] (two arrest warrants: (1) phone harassment-abuse, threaten or harass dated February 16, 2023, (2) possession of a firearm-revoked FOID card dated February 17, 2023); [21-2] (criminal sentencing order dated July 29, 2024; [23-1] (*Id.*); [23-2] (Return of Warrant dated February 17, 2023); [23-2] (same as 21-2); [23-3] (plea transcript commencing on July 29, 2024, transcribed March 21, 2025). The Court is within its discretion to do so. *Fosnight v. Jones,* 41 F.4th 916, 922 (7th Cir. 2022) ("We've long held that district courts can take judicial notice of public court documents and proceedings when considering a Rule 12(b)(6) motion."); *see also Gen. Elec. Cap. Corp. v. Lease Resol. Corp.,* 128 F.3d 1074, 1081 (7th Cir. 1997) (explaining the narrow exception to the rule "to permit a district court to take judicial notice of matters of public record without converting a motion for failure to state a claim into a motion for summary judgment."). The underlying documents establish when Lippencott was arrested on February 17, 2023, based on

two separate warrants: one for phone harassment and one for firearms offenses. On July 29, 2024, Lippencott pled guilty to the phone harassment charge. When he was sentenced on the phone harassment charge all nineteen weapons possession charges were dismissed "*nolle prosequi* per agreement." Therefore, Defendants assert that probable cause on the telephone harassment charge, as conceded by Lippencott in his guilty plea, prevents him from asserting false arrest or unlawful pretrial detention. *Heck v. Humphrey*, 512 U.S. 477, 486-487 (1994). *See also Hill v. Murphy*, 785 F.3d 242, 248 (7th Cir. 2015) (favorable judgment on a § 1983 claim can imply that a conviction is invalid without expressly invalidating it); *Mack v. City of Chicago*, 723 F. App'x 374, 376 (7th Cir. 2018) (*Heck* forbids judgment for the plaintiff because "it would cast a shadow over his conviction").

The City Defendants rely on *Taylor v. Hughes*, 26 F.4th 419, 432 (7th Cir. 2022) that indeed found that "probable cause to arrest on *any* basis precludes a false arrest claim" (emphasis added). But that case was determined at summary judgment. *Taylor* relied upon *Holmes v. Village of Hoffman Estates,* 511 F.3d 673, 682 (7th Cir. 2007), also a case at summary judgment, which confirmed that probable cause for battery precluded a claim for false arrest on other charges. The County Defendants, who make the same argument, rely on five cases: *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 762 (7th Cir. 2006); *Gray v. Burke*, 466 F. Supp. 2d 991, 998 (N.D. Ill. 2006) (J. Moran) *United States v. Davis*, 35 F. App'x 245, 246 (7th Cir. 2002*); Country Mut. Ins. Co. v. Duncan*, 794 F.2d 1211, 1215 (7th Cir. 1986); *Devenpeck v. Afford*, 543 U.S.

146, 153-54 (2004). Similarly, none of these cases were decided at the motion to dismiss stage and are thus distinguishable.

In light of (1) the allegations (that the Court must accept as true) that the defendants knowingly relied on false statements to support the firearm charges and (2) the absence of any case authority dismissing such a case (as opposed to considering the matter at the summary judgment stage), the court denies the request to dismiss on this basis.

### 2. *The City Defendants were plausibly involved in Plaintiff's arrest or prosecution*

The City Defendant Officers argue that they were not involved in Lippencott's arrest, and therefore, cannot be liable under the Fourth Amendment. The allegations of personal involvement regarding Bissegger and Gibler's involvement are indeed thin. But at this early stage, the allegations support a reasonable inference that, but for Bissegger and Gibler's reports which contained knowingly false statements, the criminal investigation would not have led to the firearm charges. Defendants further claim Lippencott's allegations that Bissegger and Gibler "directed" his arrest are conclusory. This is a conclusory allegation. But that is not the basis of their involvement. Rather, they *themselves* are alleged to have originated his criminal investigation on knowingly fabricated evidence.

Accordingly, Count I and Count III may proceed.

### C. Plaintiff's Retaliatory Arrest claim is dismissed

Defendants argue that Lippencott's retaliatory arrest claim (Count II) lacks

allegations supporting that his speech, touching on matters of public concern, was a motivating factor in his arrest. [21] at 8; [23] at 6-7. Lippencott responds that he was arrested for speaking out against his former employer, and "the arrest occurred shortly after his bond hearing" supporting a retaliatory motive. [25] at 6; [26] at 4-5. The Court agrees with Defendants.

The First Amendment prohibits a public employer from retaliating against an employee or former employee for engaging in matters of public concern. *See Callahan v. Fermon*, 526 F.2d 1040, 1043-44 (7th Cir. 2008). "To make out a *prima facie* case of First Amendment retaliation, a plaintiff must present evidence that: (1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating favor in the employer's action." *Zellner v. Herrick*, 639 F.3d 371, 378–79 (7th Cir. 2011) (citing *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir.2006)). To qualify as constitutionally protected speech, the speech must involve a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 145 (1983).

Here, the Court is hard-pressed to find any allegations in the complaint concerning speech—let alone constitutionally protected speech touching on a matter of public concern. The complaint is silent regarding any allegations that Lippencott spoke out on a matter of public concern. The first instance where Lippencott claims he spoke out against his former employer is in his response. [26] at 4. But Lippencott cannot amend his pleadings in his response. *See Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) ("It is a basic principle that the complaint may not be

amended by the briefs in opposition to a motion to dismiss."). In addition, Lippencott still fails to indicate what protected speech he engaged in. This underdeveloped claim therefore fails.

Accordingly, Count II is dismissed without prejudice.

**D. Plaintiff's Due Process claim is legally unavailable**

The City Defendants argue that Plaintiff's fabrication of evidence Due Process claim (Count IV) sounds in the Fourth Amendment. [21] at 6-7. The Court agrees with Defendants Bissegger and Gibler.

The Seventh Circuit has explained that "[a] claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment…" *Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020). Only when the plaintiff proceeds to trial and the state obtains a conviction predicated on the fabricated evidence may the plaintiff have a due process claim. *Id.* at 834-835. Because Lippencott did not proceed to trial in his state criminal case, this claim is one of unlawful pretrial detention under the Fourth Amendment (here Count III).

Accordingly, Count IV is dismissed with prejudice.

**E. Plaintiff's state law claims for false arrest, false imprisonment and conspiracy survive. Plaintiff's claims for negligent infliction of emotional distress and intentional infliction of emotional distress are time-barred.**

Defendants argue that Lippencott's claims for false arrest, false imprisonment, negligent infliction of emotional distress, and intentional infliction of emotional distress are time-barred. [21] at 9; [23] at 9-10. Lippencott responds that (1) it is unusual to dismiss a claim as time-barred under F.R.C.P. 12(b)(6) and equitable

18

tolling precludes dismissal of his state false arrest and false imprisonment charges. [26] at 5-6.

Typically, a statute of limitations defense is not appropriately raised in a motion to dismiss because plaintiffs are not required to negate affirmative defenses in their complaints. *See Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993) (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L.Ed.2d 572 (1980)). However, a plaintiff may plead facts showing that his cause of action is time-barred, thus pleading himself out of court. *Tregenza*, 12 F.3d at 718.

Here, the Illinois Tort Immunity Act ("ITIA") governs civil tort claims against local government employees. Under the ITIA, claims are subject to a one-year statute-of-limitations. 745 Ill. Comp. Stat. 10/8-101(a); *see also Williams v. Lampe*, 399 F.3d 867, 869-70 (7th Cir. 2005) ("While the two-year period still applies to § 1983 claims against [Illinois local government entities and their employees], the one-year period applies to state-law claims that are joined with a § 1983 claim.") (citing *American Nat'l Bank & Trust Co. of Chi. v. Town of Cicero,* No. 01 C 1396, 2001 WL 1631871, *14 (N.D.Ill.2001)). The statute begins to accrue when the plaintiff knows—or should have known—that his rights were violated. *Savory v. Lyons,* 469 F.3d 667, 672 (7th Cir. 2006); *see also Ellis v. City of Chicago*, No. 13 CV 2382, 2016 WL 212489, at *10 (N.D. Ill. Jan. 19, 2016) (under Illinois law, false arrest claims accrue on the date of arrest and are subject to one year statute of limitations).[4]

---

[4] Plaintiff appears to argue that a two-year statute of limitations applies to these state law claims. [26] at ¶¶ 28-30. That is incorrect as a matter of law.

Tolling on his state law claims began to accrue on the date of Lippencott's arrest: February 17, 2023. *See e.g. Gora v. Edgar*, No. 95 C 4087, 1996 WL 11938, at *2 (N.D. Ill. Jan. 10, 1996) (state law claim of false imprisonment or false arrest begin to toll on date arrest and imprisonment occurred); *see also Day v. Conwell*, 244 F. Supp. 2d 961, 962-63 (N. D. Ill. 2003) (emotional distress claims accrue on the date defendants committed the act that caused plaintiff's injuries); *Friends-Smiley v. City of Chicago*, No. 16-CV-5646, 2016 WL 6092637, at *2 (N.D. Ill. Oct. 19, 2016) (collecting cases) ("[C]ourts in this district have consistently applied *Bridewell* broadly, holding that IIED claims of this sort accrue on the day of arrest, even where the distress alleged is 'intertwined' with a claim for malicious prosecution."). Here, Lippencott did not file his complaint until February 18, 2025, over two years after his arrest date. His intentional infliction of emotional distress and negligent infliction of distress claims are therefore time-barred.

Lippencott argues that the doctrine of equitable tolling should preclude the statute of limitations from being applied to his false arrest and false imprisonment state law claims. Equitable tolling is a sparingly used doctrine, "reserved for those situations in which extraordinary circumstances prevent a party from filing on time." *Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 964 (7th Cir. 2005) (citing *Wilson v. Battles,* 302 F.3d 745, 749 (7th Cir.2002)). Lippencott argues that Defendants misled him by bringing charges against him but withholding exculpatory evidence for eighteen (18) months, and he did not learn of that evidence until June 4, 2024. The doctrine of equitable tolling requires prompt action after the basis for the legal action

20

becomes known. *See Ashafa v. City of Chicago*, 146 F.3d 459, 464 (7th Cir. 1998). (The doctrine of equitable tolling "requires that the plaintiff get the litigation under way promptly after the circumstance justifying delay is no longer present."). Although equitable tolling requires a litigant to promptly file his case once the basis for legal action becomes known—on this undeveloped record—equitable tolling is often best resolved after the pleading stage. *See Watkins v. Mohan*, 144 F.4th 926, 943 (7th Cir. 2025) (reversing the district court's dismissal of the plaintiff's claims because its "conclusion that [the plaintiff] could not benefit from equitable tolling was at least premature"); *see also Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004) (affirming denial of a motion to dismiss where plaintiff may be able to establish equitable tolling on a more developed record). The Court reserves ruling on this issue for a later stage in the litigation, when the factual record is more fully developed.

Turning to Plaintiff's state law conspiracy claim, the Court first addresses County Defendants' argument that the conspiracy claim should be dismissed for failure to comply with F.R.C.P 8 and 10. [23] at 7-8. At top, "group pleading does not violate Fed. R. Civ. P. 8 so long as the complaint provides sufficient detail to put the defendants on notice of the claims." *Lattimore v. Vill. of Streamwood*, 2018 WL 2183991, at *4 (N.D. Ill. May 11, 2018) (cleaned up); *see also Hill v. Cook Cty.*, 463 F. Supp. 3d 820, 836 (N.D. Ill. 2020) ("an allegation directed at multiple defendants can be adequate to plead personal involvement.") (cleaned up). Here, the Court finds that

Lippencott has adequately put Defendants on notice of the claims against them, as described *supra*, and declines to dismiss on this basis.

Additionally, because several of the underlying state law claims have survived, state law conspiracy does as well. *See e.g. Tillman v. Burge,* 813 F. Supp. 2d 946, 976 (N.D. Ill. July 20, 2011) ("Because the substantive claims... have survived Defendants' motion, the conspiracy allegations will not be dismissed on that basis.").

Accordingly, Plaintiff's state law false arrest, false imprisonment, and conspiracy claims survive. Plaintiff's state law intentional infliction of distress and his negligent infliction of distress claims are dismissed with prejudice.

### F. Plaintiff's state law malicious prosecution claim is waived

In order to establish malicious prosecution, Plaintiff must allege "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996). Lippencott must allege that the firearm proceedings terminated in his favor. *See id*. If he cannot plead this element, this claim fails, *Id*.; *Logan v. Caterpillar, Inc.,* 246 F.3d 912, 924 (7th Cir. 2001) ("As we have already noted, a plaintiff cannot recover for malicious prosecution unless he shows that the criminal proceeding at issue was terminated in his favor."). A malicious prosecution claim cannot be based on an underlying criminal proceedings terminated in a way that did not establish Lippencott's innocence. *Id*. at 512. The underlying criminal proceedings in Plaintiff's

firearms offense do not support favorable termination. Instead, the firearm charges were dismissed subject to an agreement where Plaintiff pled guilty to telephone harassment. Defendants argue Lippencott therefore failed to plead this requirement. [21] at 9-10; [23] at 11-12.

As an initial matter, Plaintiff did not respond to Defendants' arguments, thus waiving the argument. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived…"). For this reason alone, Lippencott's malicious prosecution claim is dismissed with prejudice. Furthermore, the disposition of the underlying firearm offense was not favorable to Lippencott. The record establishes that the firearms offenses were dismissed according to agreement, nothing more.

**Plaintiff's Punitive damages claim is not a separate cause of action**

County Defendants argue that "punitive damages" is not a cause of action.[23] at 14-15. Plaintiff responds that punitive damages are available where a defendant's actions are motivated with malicious intent or involve reckless or callous indifference to federally protected rights. [26] at 9.

The Court dismisses punitive damages as a cause of action. *Indemnified Cap. Invs., S.A. v. R.J. O'Brien & Assocs. Inc.*, 12 F.3d 1406, 1413 (7th Cir. 1993) (dismissing punitive damages claims "because it fails to state an independent cause of action"); *see also McGrew v. Heinold Commodities, Inc.,* 147 Ill.App.3d 104, 110, 100 Ill.Dec. 446, 451, 497 N.E.2d 424, 429 (1986) ("punitive damages represent a type

of relief rather than an independent cause of action"). However, punitive damages may proceed as a remedy.

Accordingly, Count VII is dismissed with prejudice.

### G. The Court declines to grant qualified immunity at this stage

City Defendants argue that qualified immunity is appropriate because it is not clearly established that recording a witness statement in a police report or repeating the witness statement constitutes a violation of constitutional rights. [21] at 11. Plaintiff responds that it is premature to grant qualified immunity at the motion to dismiss stage and it is clearly established that an arrest without probable cause violates the Fourth Amendment. [25] at 7.

"A complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001) (citing *Jacobs v. City of Chicago,* 215 F.3d 758, 765 n. 3 (7th Cir.2000)). Here, the Court declines to apply qualified immunity because it is premature. However, this does not prevent the Defendant Officers from reasserting and further developing their affirmative (QI) defense later.

### Conclusion

For the stated reasons, the Defendants' motions to dismiss [20]; [23] are granted in part and denied in part. Count I (false arrest), Count III (unlawful pretrial detention), Count V (state law tort claims of: false arrest, false imprisonment, and conspiracy), and Count VI (indemnification) survive. Count II (first amendment retaliation) is dismissed without prejudice. Count IV (Due Process), Count V (state

law tort claims of: negligent infliction of emotional distress, intentional infliction of emotional distress, malicious prosecution) and Count VII (punitive damages as a cause of action) are dismissed with prejudice. Discovery has been stayed in this matter [32]. On or before 1/9/26, the parties shall file a Joint Initial Status Report. A template for the Initial Status Report, setting forth the information required, may be found at https://www.ilnd.uscourts.gov/judges.php by clicking on Judge Rowland's name and then again on the link entitled "Initial Status Conference".

E N T E R:

Dated: December 15, 2025

_____
MARY M. ROWLAND

United States District Judge